PRESENT: All the Justices

VIRGINIA INTERNATIONAL GATEWAY, INC.

OPINION BY
JUSTICE WILLIAM C. MIMS
October 31, 2019

v. Record No. 180810

CITY OF PORTSMOUTH

FROM THE CIRCUIT COURT OF THE CITY OF PORTSMOUTH
James C. Hawks, Judge

In this case, we consider whether a real estate appraiser must be licensed in Virginia to

offer expert testimony in a tax-assessment dispute. We also consider whether the taxpayer met

its burden of proving that the assessment overvalued the subject property.

I. BACKGROUND AND MATERIAL PROCEEDINGS BELOW

Virginia International Gateway, Inc. ("VIG") owns a marine container terminal in the

City of Portsmouth fronting the Elizabeth River. The terminal consists of 610 acres including a

wharf, buildings, eight "ship-to-shore" ("STS") cranes, and other improvements. When

container ships dock at the wharf, the STS cranes unload shipping containers onto a large

container yard. Surrounding the container yard is a system of 30 remotely operated rail-mounted

gantry cranes. These gantries straddle the container yard, moving along the rails to pick up and

place containers onto waiting trucks. The terminal also uses four rubber-tire gantry cranes for

this task. The rubber-tire gantries differ from the rail-mounted gantries in that they are diesel-

powered rather than electric, require an onboard driver to operate, and have tires permitting them

to move freely around the yard.

For taxation purposes, VIG's real property includes the land, buildings and improvements

on the land, the wharf, and the eight STS cranes which are considered fixtures. For the 2015–16

tax year, the City assessed the total value of VIG's real property at $361,084,820 with the

following valuations:

| Land: | $72,946,280 |
| Buildings: | $34,357,850 |
| Improvements: | $98,425,460 |
| Wharf: | $92,998,850 |
| STS Cranes: | $62,322,200 |
| Other Real Property: | $34,180 |

The rail-mounted gantries and rubber-tire gantries are considered personal property for tax purposes. The City assessed the 30 rail-mounted gantries at $27,467,070 and the four rubber-tire gantries at $2,809,250 in both 2015 and 2016.

VIG believed the assessments for its real and personal property were above fair market value. It filed separate applications to correct the 2015–16 real estate and personal property assessments pursuant to Code § 58.1-3984. The City answered, denying that the assessments exceeded fair market value. In addition, the City filed a counterclaim to the real property application contending that the fair market value was actually several hundred thousand dollars more than the assessment. The trial court consolidated the two cases for trial, which occurred in late 2017.

A. Evidence of Real Property Valuation

At trial, VIG offered expert testimony to support its position that the actual fair market value of the real property was $197,217,000. It relied on Glen Fandl, a taxation consultant and real estate appraiser with experience evaluating complex industrial properties, to establish the value of the land, buildings, improvements, and wharf—every aspect of the real property except the STS cranes. Fandl held an active New York real estate appraisal license for all times relevant to this appeal. His work with VIG began in 2015, when he reviewed the City's assessments, visited the property, and arrived at a preliminary valuation of the real estate "in the hope of settling the case informally." When litigation became inevitable, Fandl obtained a temporary Virginia license active from January 28, 2016 to January 27, 2017, then conducted a formal

appraisal of the property's value. Fandl acknowledged that he based his formal appraisal on the initial valuation he developed in 2015 but testified that once he obtained Virginia licensure, he updated his findings to comply with the Uniform Standards of Professional Appraisal Practice ("USPAP") and other requirements for formal appraisals. He completed his appraisal report in October 2016.

The City objected to Fandl's testimony and expert qualification because he lacked Virginia licensure at the time of trial. After hearing argument, the trial court overruled the objection. It explained: "I understand that, you have to be licensed to work as an appraiser. But to qualify as an expert in this court is my determination, and I recognize Mr. Fandl as [eminently] qualified to testify both as to personal and real estate issues before this [c]ourt."

Fandl relied on a combination of the cost and sales-comparison methods to appraise the property. He followed the City's practice of assessing the unimproved land, buildings, improvements, and the wharf separately. Fandl appraised the unimproved land by comparing the property to commercial property sales around Portsmouth as well as sales of similar, though undeveloped, waterfront parcels around the country. He divided the unimproved land into the same categories used by the City, concluding that the waterfront acreage was worth $9,030,000; the commercial land was worth $16,117,000; the wetlands were worth $1,284,000; and the remaining land was worth $34,000. He opined that the unimproved land was worth a total of $26,465,000. Fandl employed the Marshall & Swift Valuation Service—a standard costing manual for commercial real estate appraisal—to estimate the replacement cost of the buildings and account for their depreciation. He concluded that the buildings had a total fair market value of $18,508,000.

Fandl then considered the improvements to the property—what he described as any improvements to the land other than the buildings or wharf, such as concrete pads, asphalt, curbs, and rails. To appraise the improvements, Fandl used the original cost information from when the terminal was first constructed, then trended those costs forward to the relevant date and adjusted for depreciation using schedules in Marshall & Swift as well as supplemental information from sources such as highway department data. He concluded that the fair market value of all the improvements was $61,125,650. He used the same approach to assess the wharf, which he appraised at $53,918,000. Fandl appraised the total fair market value of all real property other than the STS cranes at $163,017,000.

VIG then called Maarten Verheijen, a broker specializing in buying and selling container-handling equipment used by marine ports, to testify regarding the value of the STS cranes and other port equipment. The trial court qualified Verheijen as an expert in the field of valuing specialized marine terminal equipment, including STS cranes, rail-mounted gantries, and rubber-tire gantries. Verheijen acknowledged that he was unfamiliar with USPAP, International Valuation Standards, or the sales-comparison, income, and cost methods, the three primarily accepted appraisal methods in Virginia. When asked on cross-examination whether he was familiar with those valuation methods, he responded: "[I]f you are referring to any standards of appraising in the United States, then, no, we've never heard of them. We've never—we do not adhere to those standards because we are not from the United States." When asked whether he was familiar with "the actual steps that are required by appraisal organizations in Virginia and the United States," Verheijen testified that he was "not familiar with any steps that any appraisal organization here would use." Instead, he said that he used a "customer-centric approach" that incorporated elements of the sales-comparison method in valuing VIG's property.

4

Verheijen considered a variety of factors in assessing the value of the STS cranes, including market trends, the relative value of different currencies, the cranes' size and age, the cost of a new crane, modification costs, and warranty costs. He determined that the primary market for the STS cranes would be overseas. Consequently, the valuation would have to account for transportation costs and electrical conversion costs because North America uses an electrical system incompatible with any other location in the world. Verheijen emphasized that transporting an STS crane is a risky and expensive proposition, sometimes costing more than the value of the crane itself. For this reason, he opined, transportation costs must be included in the overall valuation of the crane. Moreover, he testified that because buyers of STS cranes always bear the cost of transportation, those costs factor into sales prices. Concluding that a buyer would pay no more than sixty percent of the value of a new crane and applying his analysis to the specific characteristics of VIG's eight STS cranes, he testified that their total fair market value was $34,200,000.

Thus, through the testimony of Fandl and Verheijen, VIG presented evidence that the total fair market value of all of the terminal's real property was $197,217,000—a figure $163,867,820 lower than the City's assessment.

B. Evidence of Personal Property Valuation

VIG also challenged the City's assessment of its personal property, primarily contesting the value of the rail-mounted and rubber-tire gantries. The City used a standard formula of fifty percent of original cost to assess the personal property. VIG maintained that this default approach resulted in overvaluation.

Verheijen also served as VIG's personal property valuation expert, testifying as to the value of both types of gantries. He determined that there was little, if any, domestic market for

5

the rail-mounted gantries, so—as with the STS cranes—he discounted their valuation by the transportation and technological refitting costs necessary for them to become operational in a foreign market. Accounting for these additional costs, Verheijen concluded that the rail-mounted gantries had a fair market value of $19,500,000 in 2015 and $16,500,000 in 2016. Unlike the STS cranes and rail-mounted gantries, Verheijen determined that there was a domestic market for the rubber-tire gantries and thus no corresponding need to discount for transportation-related expenses. He opined that VIG's four rubber-tire gantries had a fair market value of $1,900,000 in 2015 and $1,600,000 in 2016.

The City called David Cole, an appraiser specializing in machinery and equipment valuations, as its personal property valuation expert. The trial court qualified him as an expert based on his "vast knowledge of different items of equipment," noting that his inexperience with marine terminal equipment went only to the weight of his opinion. Cole relied on the cost approach for valuing the rail-mounted gantries and both a cost and sales-comparison approach for the rubber-tire gantries. He concluded that, after accounting for depreciation and functional obsolescence, the 30 rail-mounted gantries had a total fair market value of $34,800,000 in 2015 and $27,300,000 in 2016. He appraised the four rubber-tire gantries at a total value of $2,255,000 in 2015 and $2,085,000 in 2016. Based on these figures, the City contended that VIG was unable to show that the City's assessment exceeded the personal property's fair market value.

Cole also challenged Verheijen's inclusion of transportation-related costs in his appraisal. He observed that, although Verheijen did not define his approach to valuation, he believed Verheijen had employed a "fair market value removed" method. This approach, Cole testified, deducts the cost of removing the asset to another location from the asset's fair market value. As

6

such, he opined, Verheijen's valuation did not comply with the definition of "fair market value" required for Virginia appraisals.

C. The Final Order

On March 22, 2018, the trial court entered a final order dismissing both of VIG's applications as well as the City's counterclaim. The trial court dismissed VIG's real estate case because it reversed its prior decision to qualify Fandl as an expert. The order indicated that the trial court maintained its twice-iterated view that Fandl was "[eminently] qualified to testify," noting that "his history of licensure in the State of New York and twice temporarily in Virginia, along with his previous designation as an appraiser by the American Society of Appraisers, was adequate evidence of his expertise enabling him to formulate a knowledgeable opinion as to real estate values." Nevertheless, the trial court found that "it was an abuse of power to recognize Mr. Fandl as an expert in real estate values in Virginia and permit his testimony because his appraisal work was unlicensed and he was again unlicensed at the time he gave his testimony." It expressly adopted the reasoning in *Appalachian Power Co. v. Orr*, 40 Va. Cir. 370 (Washington Cty. 1996), and *Commonwealth Transportation Commissioner v. Baxter*, 44 Va. Cir. 148 (Spotsylvania Cty. 1997), to hold that its decision to exclude Fandl was "a trial judge's aversion to exercising a power which will serve to promote illegal conduct." In essence, the trial court ruled that qualifying Fandl as an expert would be a misuse of judicial power because it would promote illegal conduct given Virginia's statutory licensure requirement for real estate appraisers.

The trial court additionally rejected Verheijen's opinion on the personal property's value, largely because he included transportation-related costs in his appraisals. It noted that costs of removal are not part of Virginia's definition of fair market value and their inclusion rendered

7

Verheijen's testimony "flawed." These costs, it held, "are not required by the general understanding of fair market value and are too speculative to be considered as a special factor in valuing" the gantries. The trial court ultimately determined that VIG failed to carry its burden of establishing that the City overvalued the personal property. Thus finding VIG's evidence of fair market value lacking as to both the real and personal property, the trial court declined to adjust any of the assessments at issue.

We awarded VIG this appeal.

## II. ANALYSIS

VIG's assignments of error raise two primary issues: whether a real estate appraiser must have an active Virginia license to testify as an expert and whether VIG failed to rebut the presumption that the City's assessments were correct.

A. Licensure and Qualification of Real Estate Appraisal Expert

To the extent the trial court's decision excluding Fandl turned on its interpretation of a statute, that interpretation presents a question of law we review de novo. *See Conyers v. Martial Arts World of Richmond, Inc.*, 273 Va. 96, 104 (2007). "The admission of expert testimony is committed to the sound discretion of the trial judge, and we will reverse a trial court's decision only where that court has abused its discretion." *Brown v. Corbin*, 244 Va. 528, 531 (1992). "Where a statute designates express qualifications for an expert witness, the witness must satisfy the statutory criteria in order to testify as an expert." *Commonwealth v. Allen*, 269 Va. 262, 273 (2005). In the absence of overt criteria, however, ordinary principles governing expert testimony apply. *Id.*

1.  Development of the Statutory Scheme

Code § 54.1-2011(A) provides that it is "unlawful to engage in the appraisal of real estate or real property for compensation or valuable consideration in this Commonwealth without first obtaining a real estate appraiser's license." Code § 54.1-2010, in turn, sets forth various categories of people who are exempt from this licensure requirement. Nothing in the statute prior to 1995 could be construed as relating to expert testimony, although the question of unlicensed appraisal testimony arose from time to time in the lower courts.

Seeking guidance on how to resolve that issue, in 1993 the Amherst County Commonwealth's Attorney asked the Attorney General whether a real estate broker without a real estate appraisal license could testify, for compensation, regarding the value of real property in judicial proceedings. 1993 Op. Atty. Gen. 211, 211. The Attorney General opined that under Code §§ 54.1-2010 and 54.1-2011,

> it is unlawful for anyone, including a licensed real estate broker, who does not have a real estate appraiser's license to testify for compensation about the value of real estate in any court proceeding, unless permitted under applicable statutory exceptions.

*Id.* at 212. Several months after the Attorney General offered his opinion, the Circuit Court of Arlington County faced the same question as a dispositive issue. Lee Gardens Arlington Limited Partnership challenged the County's 1992 real estate tax assessment of a large apartment complex it owned, offering a tax consultant named George Byrne as its compensated expert to testify regarding the property's value. The County objected to Byrne's testimony because he lacked a Virginia real estate appraiser's license. Relying on the Attorney General's opinion, the circuit court refused to qualify Byrne and ultimately granted the County's motion to strike Lee Gardens' case. The circuit court entered its final order on November 18, 1994, and a notice of appeal was filed shortly thereafter.

9

Meanwhile, at the start of the 1995 legislative session, House Bill 2087 was introduced. Among other things, it made inconsequential edits to Code § 54.1-2010 having no effect on Lee Gardens' case. After passing the House, the bill was referred to the Senate Committee on General Laws. On February 15, 1995, that Committee proposed an additional amendment, inserting a new subsection B that read:

> Nothing contained herein shall proscribe the powers of a judge to determine who may qualify as an expert witness to testify in any legal proceeding. This provision is declarative of existing law.[1]

This new language, if adopted, would directly affect the issue in Lee Gardens' pending appeal. Less than a week later, Lee Gardens filed its petition for appeal in this Court. The full House and Senate approved the Committee's amendments and passed the bill unanimously. The Governor signed it into law on March 16, 1995. 1995 Acts ch. 327. On May 26, 1995, this Court granted Lee Gardens' petition for appeal.

The new Code § 54.1-2010(B) took effect on July 1, 1995. On July 7, 1995, Lee Gardens—represented by Virginia-licensed counsel based in a Maryland office—filed its opening brief citing only preexisting language from that statute, apparently unaware of the newly enacted and highly relevant subsection B. The County filed its brief on August 3, 1995, similarly quoting the statute's long-standing language but failing to reference new subsection B. Lee Gardens' reply brief omitted any reference to Code § 54.1-2010 entirely.

---

[1] The term "declarative of existing law" is used occasionally by the General Assembly when it wishes to clarify a statute or correct an interpretation of a statute with which it disagrees. It typically is placed in a second enactment clause rather than in the codified statutory language. *See, e.g.*, 2016 Acts ch. 186 ("Be it enacted by the General Assembly of Virginia: 1. That § 64.2-719 of the Code of Virginia is amended and reenacted as follows: . . . . 2. That the provisions of this act are declarative of existing law.").

The Court issued its opinion in *Lee Gardens Arlington Limited Partnership v. Arlington County Board*, 250 Va. 534 (1995), on November 3, 1995. It characterized the case as presenting a question of first impression: "[W]hether a person unqualified to obtain an appraiser's license can testify as an expert witness on real estate valuation." *Id.* at 539. To answer that question, the Court adopted the Attorney General's conclusion from the 1993 opinion to hold that the circuit court had properly refused to accept Byrne's testimony. *Id.* at 540. It observed that the "General Assembly is presumed to have knowledge of the Attorney General's interpretation of statutes and the General Assembly's failure to make corrective amendments evinces legislative acquiescence in the Attorney General's interpretation." *Id.* (quoting *City of Winchester v. American Woodmark Corp.*, 250 Va. 451, 458 (1995)). The Court concluded: "Had the legislature intended to make 'corrective amendments' to Chapter 20.1 of Title 54.1 enacted in 1990, it could have done so. It did not." *Id.*

*Lee Gardens* did not accurately reflect Virginia statutory law at the time it was decided, largely because the General Assembly's 1995 enactment of subsection B was a corrective amendment that apparently was intended to reject the Attorney General's interpretation. The opinion's silence regarding the amendment subsequently posed a challenge for trial courts. For instance, in *Appalachian Power Co. v. Orr*, 40 Va. Cir. 370, 370 (Washington Cty. 1996), the circuit court applied *Lee Gardens* to hold that although a potential appraisal expert "is probably eminently qualified and, most likely, could *qualify* as an expert in this court, he is not *allowed* to render his expert opinion in the context of this case if he is compensated unless he is a licensed appraiser." It acknowledged Appalachian Power's contention that the 1995 amendment may have gone unnoticed by the *Lee Gardens* Court and noted that, in its "humble opinion, there was room for at least a footnote reference to the same in that opinion." *Id.* at 371. Nevertheless, the

11

circuit court acknowledged that *Lee Gardens* constituted binding precedent. "If it is to be changed," the court noted, "it must be done by the legislature." *Id.*

The circuit court in *Commonwealth Transportation Commissioner v. Baxter*, 44 Va. Cir. 148, 152 (Spotsylvania Cty. 1997), addressed the same issue one year later, ruling that an unlicensed appraiser could not testify as an expert for compensation. Similarly observing that *Lee Gardens* did not acknowledge the 1995 amendment, the court concluded that the amendment's language effectively adopted the Attorney General's opinion: "When the legislature enacted the amendment, and qualified it with the proviso that the amendment is 'declarative of existing law,' the legislature evinced acquiescence in the Attorney General's interpretation." *Id.* at 151.

The *Baxter* court offered a further rationale for its decision rooted in Code § 54.1-2011(A)'s prohibition of providing compensated real estate appraisals without a license:

> By definition, an appraisal involves an analysis, opinion or conclusion relating to the value of real estate. If a court were to allow such testimony, it would be condoning, even abetting, unlawful conduct. For that reason alone, a court should not qualify such a person and allow him to testify as an expert witness about the results or product of his appraisal.

*Id.* (citation omitted). The circuit court ultimately "exercise[d] its power to refuse to qualify an unlicensed appraiser as an expert witness so as to allow that witness to give an opinion about the value of real estate that would be based upon, and the product of, an unlawful appraisal," creating an example that the trial court in this case would follow. *Id.* at 152.

Both circuit courts reached erroneous conclusions largely due to their reliance on *Lee Gardens*. The court in *Orr*, in its attempt to reconcile the statutory text with *Lee Gardens*, looked ahead to future legislative action when the 1995 amendment had already clarified that the court had the power to qualify the unlicensed appraiser as an expert. Similarly, the *Baxter* court

12

misconstrued the effect of the "declarative of existing law" provision. Far from "evinc[ing] acquiescence in the Attorney General's interpretation," as *Baxter* held, that language appears to have been intended to repudiate the 1993 opinion.

In light of this background, the 1995 amendment to Code § 54.1-2010(B) provides that a trial court may qualify a person as an expert witness to testify regarding the value of real estate without regard to his or her Virginia licensure status.[2] It did not, however, render licensure status irrelevant. Licensure remains an important consideration in assessing a prospective expert's qualifications. Code § 54.1-2010(B) stands only for the proposition that a trial court cannot refuse to qualify an otherwise appropriate expert solely for the lack of an active Virginia license at trial. With these principles in mind, we turn to the trial court's decision in this case.

2. Effect on Fandl's Qualification

In its final order, the trial court acknowledged that Fandl's "history of licensure in the State of New York and twice temporarily in Virginia, along with his previous designation as an appraiser by the American Society of Appraisers, was adequate evidence of his expertise enabling him to formulate a knowledgeable opinion as to real estate values." Despite its belief that Fandl was qualified to testify as an expert and that it had the power to qualify him, it refused to do so because it found that Fandl's "appraisal work was unlicensed and he was again unlicensed at the time he gave his testimony." This was error.

Although the trial court referenced *Lee Gardens*, *Orr*, and *Baxter*, it primarily relied on the aversion to promoting illegal conduct discussed in *Baxter* to justify excluding Fandl. As an

_____

[2] In 1999, the General Assembly removed the sentence, "This provision is declarative of existing law," from § 54.1-2010(B). 1999 Acts ch. 259. The reason for this removal is not apparent from the legislative record, and we decline to speculate as to the legislature's motivation. The removal of the sentence four years after it was added does not bear upon our analysis.

13

initial matter, the trial court's finding that Fandl's appraisal work was unlicensed is without evidentiary support. Although Fandl did develop an informal, preliminary valuation in 2015 prior to obtaining a Virginia license, he secured a temporary Virginia appraisal license effective from January 28, 2016 to January 27, 2017. During this period of active licensure, Fandl updated his initial valuation and brought it into compliance with the standards governing real estate appraisals in Virginia. He completed his final appraisal report in October 2016, within the period of active licensure. Fandl's testimony addressed only the appraisal for which he was licensed. As such, there could be no reasonable concern that permitting his testimony would condone or promote an unlawful activity even though he lacked a Virginia license at trial.

This lack of licensure at trial was the other ground on which the trial court excluded Fandl's testimony. As discussed at length above, this testimony was unobjectionable under Code § 54.1-2010(B). The trial court's two bases for excluding Fandl respectively sought to prevent illegal conduct that did not exist and relied upon an incorrect statement of law regarding unlicensed appraisal testimony. The exclusion of his testimony thus constituted an abuse of its discretion. *See Landrum v. Chippenham & Johnston-Willis Hosps., Inc.*, 282 Va. 346, 352 (2011) (holding that a trial court abuses its discretion "by giving significant weight to an irrelevant or improper factor"); *Porter v. Commonwealth*, 276 Va. 203, 260 (2008) (holding that "[a circuit] court by definition abuses its discretion when it makes an error of law" (quoting *Koon v. United States*, 518 U.S. 81, 100 (1996))).

B. Personal Property Valuation

VIG's remaining assignments of error challenge the trial court's failure to order corrected personal property assessments. As we analyze personal property assessment, which is distinct from real estate assessment, the recent decision in *Western Refining Yorktown, Inc. v. County of*

14

*York*, 292 Va. 804 (2016), stands front and center in our jurisprudence. We will follow its methodology as we consider VIG's personal property case.

When a taxpayer challenges an incorrect personal property tax assessment pursuant to Code § 58.1-3984, "it is well settled that there is a presumption in favor of the correctness of a tax assessment and the burden is upon the property owner who questions it to show that the value fixed by the assessing authority is excessive." *Id.* at 817 (quoting *Norfolk & W. Ry. Co. v. Commonwealth*, 211 Va. 692, 695 (1971)). The presumption does not give way "even if the assessor is unable to come forward with evidence to prove [its] correctness." *Id.* It is therefore not enough for the taxpayer to prove that the assessment is flawed. Instead, the "taxpayer seeking relief from an allegedly erroneous assessment has the burden to show that the assessment exceeds fair market value." *Id.* at 818 (quoting *County of Albemarle v. Keswick Club, L.P.*, 280 Va. 381, 388 (2010)). We view the evidence and all reasonable inferences arising from that evidence in the light most favorable to the prevailing party at trial—here, the City—and will reverse for insufficient evidence only if the trial court's decision is plainly wrong or unsupported by the evidence. *Id.* at 815.

*Western Refining* is particularly instructive because the taxpayer there, like VIG, contested assessments of highly specialized personalty with limited marketability. 292 Va. at 809–10. At issue in *Western Refining* was the valuation of machinery and tools used in an oil refinery. *Id.* at 810. York County assessed the equipment at 25 percent of its original cost, concluding that it was worth $96.1 million in 2010 and $99.1 million in 2011. *Id.* The refinery challenged these valuations by retaining an expert appraiser with extensive oil industry experience. *Id.* at 811. The expert used the sales-comparison, income, and cost approaches to assess the equipment's value, reaching a final appraisal by determining the site's overall value

15

then deducting each component, such as real estate and improvements, until all that remained—in his opinion—was the value of the machinery and tools. *Id.* at 813. That amount, he concluded, was $32 million in 2010 and $24 million in 2011. *Id.* The County defended its assessment by retaining its own expert who similarly applied the three accepted valuation approaches. *Id.* The County's expert, however, concluded that the equipment was worth $215.4 million in 2010 and $198 million in 2011. *Id.* The circuit court found that the County's assessment was prima facie correct and rejected the refinery's expert testimony for using a flawed methodology. *Id.* at 815. Concluding that the refinery failed to prove the County had assessed the equipment at more than its fair market value, the court declined to alter the assessment. *Id.*

We affirmed the circuit court's ruling, finding that, under the presumption of correctness and the deferential standard of review, the refinery's evidence did not prove that the County overvalued its equipment. *Id.* at 816. In reaching this conclusion, we identified several reasons why the refinery failed to rebut the presumption of correctness. We initially observed that the legislature had expressly approved personal property valuations using a fixed percentage of original cost. *Id.* at 817. Recognizing that this uniform approach may not necessarily render an accurate valuation when applied to a particular chattel, we emphasized that fixed-percentage-of-original-cost valuations are "not the final word"—instead, taxpayers who believe this methodology overvalues their property can obtain an independent appraisal and ask the municipality to reconsider its assessment. *Id.* The refinery did so, and we recognized that the County "gave careful consideration to the appraisal but rejected it." *Id.* at 822. The County then retained an independent appraisal expert to support its position that the original valuation did not overvalue the equipment. *Id.* at 825–26. After "hear[ing] extensive testimony concerning the

16

flaws with [the refinery's] approach," the circuit court rejected the refinery's expert evidence and accepted that of the County. *Id.* at 824. We ultimately concluded that the evidence before the circuit court "established a possible range of values for the refinery's machinery and tools" and that, in light of the presumption of correctness, the refinery had not proven that the County overvalued its equipment. *Id.*

This analysis guides our resolution of this factually and legally similar case. Here, the City assessed VIG's personal property, the gantries, at fifty percent of original value, resulting in what VIG considered an overvaluation. VIG retained Verheijen to provide an independent appraisal to challenge the City's assessment. The City refused to change its assessment and retained Cole, its own independent appraisal expert, who testified that Verheijen's methodology was flawed and that the City's assessment did not overvalue the gantries. The trial court, like the *Western Refining* court, rejected Verheijen's methodology and accepted the City's evidence, entering a verdict for the City.

On review of the trial court's ruling, we first recognize that although the City's fifty-percent-of-original-cost methodology creates a higher actual tax rate than that in *Western Refining*, it remains an approach expressly authorized by the General Assembly. *See* Code § 58.1-3503(A)(18); *Western Refining*, 292 Va. at 816. The presumption of correctness means that the City's fifty-percent-of-original-cost methodology is prima facie appropriate "even if the assessor is unable to come forward with evidence to prove [its] correctness." *Western Refining*, 292 Va. at 817. Here, however, the City not only came forward with evidence of the assessment's correctness in the form of Cole's independent appraisal, it also presented evidence that VIG's appraisal of the gantries was flawed.

VIG contends that the trial court improperly rejected Verheijen's methodology and did not accord sufficient weight to his status as one of the only container terminal valuation experts in the world. Although Verheijen's expertise is undisputed, he readily acknowledged that his appraisal methodology did not comply with the ordinary principles of valuation used in Virginia. Whereas the refinery's expert in *Western Refining* simply made mistakes in his application of the otherwise appropriate sales-comparison, income, and cost approaches, Verheijen testified that he was unfamiliar with these methods and instead used a "customer-centric approach" that incorporated some characteristics of the sales-comparison method.

Moreover, in urging us to accept Verheijen's appraisal, VIG asks us to recognize a novel and significant cost factor relating to transportation of personalty. VIG contends that because the only feasible markets for its personal property are abroad, transportation and related costs—such as retrofitting for compatibility with a foreign electrical system—should be deducted from the property's fair market value.

VIG's arguments are intriguing. We need not, however, determine whether transportation and related costs are an appropriate component of fair market value in this case. The trial court found that VIG's evidence of removal and conversion costs for the gantries was "too speculative to be considered as a special factor in valuing these cranes." Largely owing to the unique nature of the gantries and the relatively small market for them, VIG had only scant evidence with which it sought to estimate the cost of moving them. The trial court, as fact finder, reasonably determined that VIG's evidence of transportation costs was too speculative to be considered.[3]

---

[3] We specifically note that VIG's argument regarding transportation-related costs for the STS cranes is distinct from its personal property argument, not least because the STS cranes are

18

Additionally, as the trial court observed, these transportation-related costs largely account for the difference between the City's assessment and VIG's opinion of the gantries' fair market value. But for these costs, VIG lacks a colorable argument that the City overvalued its personal property. The City, for its part, put on evidence that VIG's methodology was flawed because of its failure to adhere to recognized valuation approaches. Its evidence also tended to show that the original assessment did not overvalue the personal property.

The trial court, as the trier of fact in this case, was responsible for the difficult task of assessing the witnesses' credibility, parsing their conflicting testimony, and ultimately weighing the evidence. *Western Refining*, 292 Va. at 816. Because the City prevailed at trial, we must view that evidence in the light most favorable to it. So viewed, and in light of the combined weight of the considerations articulated above, we hold that there was sufficient evidence in the record to support the trial court's ruling that VIG did not rebut the presumption of correctness. Accordingly, it did not err in declining to adjust the personal property assessment.

III. CONCLUSION

The trial court's exclusion of Fandl—whose testimony formed the vast majority of VIG's evidence in the real estate case—was an abuse of discretion. We reverse the real estate case and remand it for further proceedings. The trial court did not err in ruling that VIG failed to overcome the presumption of the personal property assessment's correctness. Accordingly, we affirm the personal property case.

*Affirmed in part,*
*reversed in part,*
*and remanded.*

---

considered real estate. We do not consider this separate argument here because, as noted earlier, the trial court did not rule on the STS cranes' assessment.

19